SLIP OPINION

# SUPREME COURT OF ARKANSAS

No. CV-15-992

WENDY KELLEY, IN HER OFFICIAL
CAPACITY AS DIRECTOR,
ARKANSAS DEPARTMENT OF
CORRECTION; AND ARKANSAS
DEPARTMENT OF CORRECTION
APPELLANTS

V.

STACEY JOHNSON, JASON
MCGEHEE, BRUCE WARD, TERRICK
NOONER, JACK JONES, MARCEL
WILLIAMS, KENNETH WILLIAMS,
DON DAVIS, AND LEDELL LEE
APPELLEES

Opinion Delivered: June 23, 2016

APPEAL FROM THE PULASKI
COUNTY CIRCUIT COURT
[60CV-15-2921]

HONORABLE WENDELL
GRIFFEN, JUDGE

REVERSED AND DISMISSED;
MOTION TO STRIKE MOOT.

**COURTNEY HUDSON GOODSON, Associate Justice**

Appellants Wendy Kelley, in her official capacity as Director of the Arkansas Department of Correction, and the Arkansas Department of Correction (collectively "ADC") appeal the orders entered by the Pulaski County Circuit Court denying their motions to dismiss and for summary judgment against multiple claims challenging the constitutionality of Act 1096 of 2015 brought by appellees Stacey Johnson, Jason McGehee, Bruce Ward, Terrick Nooner, Jack Jones, Marcel Williams, Don Davis, and Ledell Lee (collectively "Prisoners"). For reversal, ADC contends that the Prisoners failed to sufficiently plead and prove their asserted constitutional violations in order to overcome the defense of sovereign immunity. We reverse the circuit court's decision in toto and dismiss the Prisoners' amended complaint.

SLIP OPINION

I. *Factual Background*

This litigation was initiated by the Prisoners who are under sentences of death for capital murder, and the issues are centered on Act 1096 of 2015 (the "Act"), which is codified at Arkansas Code Annotated section 5-4-617 (Supp. 2015). The Act establishes the current method by which executions are to be conducted in Arkansas.

The Act amends the previous method-of-execution statute, formerly found at Arkansas Code Annotated section 5-4-617 (Repl. 2013), that was passed into law by Act 139 of 2013. Under Act 139, the protocol entailed the intravenous administration of a benzodiazepine to be followed by a "lethal injection of a barbiturate in an amount sufficient to cause death." Ark. Code Ann. § 5-4-617(a) & (b) (Repl. 2013). It also exempted information about execution procedures and their implementation from the Arkansas Freedom of Information Act (FOIA). Ark. Code Ann. § 5-4-617(g) (Repl. 2013). The Prisoners, with the exception of Ledell Lee, previously brought a declaratory-judgment action against ADC in regard to Act 139. In that complaint, the Prisoners asserted, among other things, that Act 139 violated the separation-of-powers doctrine under the Arkansas Constitution because the statute delegated unbridled discretion to ADC in determining which drug was to be used for lethal injection. In connection with that lawsuit, the parties entered into a settlement agreement on June 14, 2013. Because ADC had decided not to employ the then existing lethal-injection protocol, the Prisoners agreed to forgo their as-applied claims contesting the constitutionality of the protocol in exchange for ADC's agreement to not raise the defense of res judicata should the Prisoners reassert an as-applied claim. Also as part of the settlement, ADC agreed to provide a copy of the new protocol,

and once the selected drugs were obtained, to "disclose the packaging slips, package inserts, and box labels received from the supplier." Ultimately, the Prisoners prevailed in the circuit court on their facial challenge to Act 139. However, this court reversed, holding that Act 139 did not violate separation of powers because the statute provided reasonable guidelines to ADC in determining the method to use in carrying out the death penalty. *Hobbs v. McGehee*, 2015 Ark. 116, 458 S.W.3d 707.[1]

Act 1096 became effective on April 6, 2015, soon after our decision in *McGehee*. The salient features of the present Act are two-fold. First, it modifies the permissible means of execution by lethal injection:

> (c) The department shall select one (1) of the following options for a lethal-injection protocol, depending on the availability of the drugs:
>
> > (1) A barbiturate; or
> >
> > (2) Midazolam, followed by vecuronium bromide, followed by potassium chloride.

Ark. Code Ann. § 5-4-617(c) (Supp. 2015). Further, the Act provides that the drugs used to carry out the lethal injection shall be (1) approved by the United States Food and Drug Administration (FDA) and made by a manufacturer approved by the FDA; (2) obtained by a facility registered with the FDA; or (3) obtained from a compounding pharmacy that has been accredited by a national organization that accredits compounding pharmacies. Ark.

---

[1] Prior to the decision in *McGehee*, *supra*, this court struck down the 2009 Methods of Execution Act on a separation-of-powers claim because the legislation granted ADC the unfettered discretion to determine all protocols and procedures for implementing executions, including the chemicals to be used. *Hobbs v. Jones*, 2012 Ark. 293, 412 S.W.3d 844.

SLIP OPINION

Code Ann. § 5-4-617(d) (Supp. 2015). Like Act 139 of 2013, the Act also provides that the ADC shall carry out the sentence of death by electrocution if execution by lethal injection is invalidated by a final and unappealable court order. Ark. Code Ann. § 5-4-617(k) (Supp. 2015).

The second departure from the former law lies in the Act's nondisclosure provisions. While the Act maintains the previous FOIA exemption, it also contains the following confidentiality requirements:

> (2) The department shall keep confidential all information that may identify or lead to the identification of:
>
>> (A) The entities and persons who participate in the execution process or administer the lethal injection; and
>>
>> (B) The entities and persons who compound, test, sell, or supply the drug or drugs described in subsection (c) of this section, medical supplies, or medical equipment for the execution process.
>
> (3) The department shall not disclose the information covered under this subsection in litigation without first applying to the court for a protective order regarding the information under this subsection.

Ark. Code Ann. § 5-4-617(i) & (j). As pertinent here, the Act permits ADC to make available to the public the following information, so long as the identification of the seller, supplier, or testing laboratory is redacted and maintained as confidential: package inserts and labels, if the drugs used in the protocol have been made by a manufacturer approved by the FDA; reports obtained from independent testing laboratories; and ADC's procedure for administering the drugs, including the contents of the lethal-injection drug box.

The Prisoners first filed suit in April 2015 against ADC in the Pulaski County Circuit Court, challenging the constitutionality of the Act. ADC removed the action to federal

court. However, the Prisoners promptly dismissed the federal case without prejudice and returned to the circuit court with the filing of an amended complaint, asserting claims only under the Arkansas Constitution. In response to a motion to dismiss filed by ADC, the Prisoners filed the present action under a new case number.

During the course of the litigation, ADC informed the prisoners of its intent to execute them using the three-drug combination of Midazolam, vecuronium bromide, and potassium chloride. In connection with that disclosure, ADC provided to the Prisoners package inserts and labels for the drugs, redacting the identity of the supplier of the drugs, in accordance with the Act. ADC also provided the Prisoners with the lethal-injection protocol to be used in the executions. The protocol calls for a total dose of 500 milligrams of Midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride. On September 9, 2015, the State set execution dates for each of the Prisoners, except Ledell Lee. On application of the Prisoners, the circuit court issued a temporary restraining order staying the scheduled executions. On October 20, 2015, this court granted ADC's petition for writ of certiorari to lift the stays of execution erroneously ordered by the circuit court, based on the holding that a circuit court, in no uncertain terms, lacks the authority to stay executions. *Kelley v. Griffen*, 2015 Ark. 375, 472 S.W.3d 135. However, we simultaneously granted the Prisoners' request to stay their executions pending the resolution of the underlying litigation. *Id.*

Meanwhile, on September 28, 2015, the Prisoners filed an amended complaint, which is the operative pleading at issue in this appeal. The amended complaint contains separate causes of action that fall into two categories: claims challenging the constitutionality

of the Act's nondisclosure provisions regarding the identity of the supplier of the drugs, and claims challenging the constitutionality of the selected method of execution. Each claim is made under the Arkansas Constitution. With respect to nondisclosure, the Prisoners alleged that the confidentiality provisions of the Act (1) violate the Contract Clause, found at article 2, section 17, by impairing the disclosure obligations undertaken by ADC in the June 2013 settlement agreement; (2) offend the freedoms of speech and of the press guaranteed by article 2, section 6; (3) violate their rights to procedural protections that are part of the Cruel or Unusual Punishment Clause set forth in article 2, section 9; (4) transgress the right to procedural due process under article 2, section 8; (5) violate separation of powers by precluding adequate judicial review of the means of execution; and (6) are contrary to the Publication Clause found at article 19, section 12. Regarding the means of execution, the Prisoners alleged that (1) implementation of the Act violates the right of substantive due process found in article 2, section 8 of the Arkansas Constitution; (2) the Act violates separation of powers under article 4 by delegating unfettered discretion to ADC; (3) execution using either the three-drug-Midazolam protocol, compounded drugs, or electrocution constitutes cruel or unusual punishment under article 2, section 9; and (4) the Act violates the Ex Post Facto Clause of article 2, section 17.

ADC filed a motion to dismiss the amended complaint on the ground of sovereign immunity. In the motion, ADC argued that the Prisoners' claims were barred by sovereign immunity because the complaint failed to state cognizable claims of any constitutional violation. In an order dated October 9, 2015, the circuit court dismissed the Prisoners' separation-of-powers claim as to the allegation of improper delegation of authority, based

on this court's decision in *McGehee*, *supra*, but the court denied the motion to dismiss with regard to the contract-clause claim, the freedom-of-speech and press claim, the claims regarding procedural due process, the separation-of-powers claim with respect to the function of the judiciary, and the method-of-execution claims that the lethal-injection procedure violates the ban on cruel or unusual punishment and the alleged right of substantive due process to be free of objectively unreasonable risks of substantial and unnecessary pain and suffering.

ADC subsequently filed a motion asking the circuit court to address its request for dismissal with regard to three of the Prisoners' claims that the circuit court had neglected to rule on in its October 9, 2015 order. On October 22, 2015, the circuit court entered a supplemental order to provide a decision concerning the omitted claims. The court dismissed the Prisoners' contention that the Act violated the ex post facto clause of the Arkansas Constitution, but the court denied the motion to dismiss the claim regarding the publication clause of the Arkansas Constitution and the due-process claim asserted in conjunction with the allegation of cruel or unusual punishment. The circuit court also ruled that the Prisoners had pled sufficient facts demonstrating feasible alternatives to the current method of execution. ADC filed a notice of appeal from the two orders ruling on their motion to dismiss.

The Prisoners moved for partial summary judgment, and ADC moved for summary judgment on all the remaining claims asserted by the Prisoners. In its motion, ADC argued that it was entitled to summary judgment on grounds of sovereign immunity because the Prisoners had not proved viable claims of any constitutional violation. The circuit court

entered an order on December 3, 2015, granting summary judgment on the disclosure claims and denying summary judgment on the means-of-execution claims. Specifically, the court granted ADC's motion for summary judgment on the remaining separation-of-powers claim. The circuit court granted the Prisoners' motion for summary judgment on their contract-clause claim, their claim regarding freedoms of speech and the press, their claims regarding due process, and the publication-clause claim. The circuit court denied ADC summary judgment on the Prisoners' substantive due-process claim and the cruel-or-unusual-punishment claim, ruling that those issues could not be decided as a matter of law because material questions of fact remained in dispute. ADC filed a timely notice of appeal from this order.

The parties also litigated the question of a protective order. In its December 3, 2015 order, the circuit court denied ADC's request for a protective order and directed it to identify the manufacturer, seller, distributor, and supplier of any lethal-injection drugs to be used in executions by no later than noon on December 4, 2015. On December 3, 2015, ADC applied to this court for an immediate stay of the circuit court's order. On that same day, we granted a temporary stay of the circuit court's disclosure order pending briefing. On January 7, 2016, we issued an immediate stay of all proceedings in the circuit court during the pendency of this appeal.

II. *Propriety of the Appeal*

In their brief, the Prisoners contend that this court lacks jurisdiction to hear the appeal because the circuit court did not specifically rule on the issue whether ADC is entitled to sovereign immunity. In response, ADC argues that the appeal is proper because sovereign

immunity was the sole basis on which it moved for dismissal and for summary judgment and that the circuit court has ruled on all the issues raised in their motions.

The general rule is that the denial of a motion for summary judgment is neither reviewable nor appealable. Ark. R. App. P.−Civ. 2(a)(10); *Bd. of Trs. v. Pulaski Cty.*, 2013 Ark. 230. However, Rule 2(a)(10) of the Arkansas Rules of Appellate Procedure−Civil permits an appeal from an interlocutory "order denying a motion to dismiss or for summary judgment based on the defense of sovereign immunity." The rationale justifying an interlocutory appeal is that the right to immunity from suit is effectively lost if the case is permitted to go to trial. *Ark. State Claims Comm'n v. Duit Constr. Co.*, 2014 Ark. 432, 445 S.W.3d 496.

As we have explained, sovereign immunity is jurisdictional immunity from suit, and jurisdiction must be determined entirely from the pleadings. *Fitzgiven v. Dorey*, 2013 Ark. 346, 429 S.W.3d 234. This defense arises from article 5, section 20 of the Arkansas Constitution, which provides: "The State of Arkansas shall never be made a defendant in any of her courts." This court has extended the doctrine of sovereign immunity to include state agencies. *Ark. Dep't of Cmty. Corr. v. City of Pine Bluff*, 2013 Ark. 36, 425 S.W.3d 731. In determining whether the doctrine of sovereign immunity applies, the court should determine if a judgment for the plaintiff will operate to control the action of the State or subject it to liability. *Ark. Dep't of Human Servs. v. Fort Smith Sch. Dist.*, 2015 Ark. 81, 455 S.W.3d 294. If so, the suit is one against the State and is barred by the doctrine of sovereign immunity, unless an exception to sovereign immunity applies. *Ark. Dep't of Envtl. Quality v. Al-Madhoun*, 374 Ark. 28, 285 S.W.3d 654 (2008). This court has recognized three ways

in which a claim of sovereign immunity may be surmounted: (1) the State is the moving party seeking specific relief; (2) an act of the legislature has created a specific waiver of sovereign immunity; or (3) the state agency is acting illegally, unconstitutionally, or if a state-agency officer refuses to do a purely ministerial action required by statute. *Bd. of Trs. v. Burcham*, 2014 Ark. 61. The third exception is at issue in this appeal.

In arguing that the appeal is improper, the Prisoners refer to our decision in *Arkansas Lottery Commission v. Alpha Marketing*, 2012 Ark. 23, 386 S.W.3d 400, where we held that, before an interlocutory appeal may be taken under Rule 2(a)(10), a circuit court must provide a ruling on the defense of sovereign immunity. In that case, Alpha Marketing had filed a declaratory-judgment action against the Lottery Commission claiming that it was entitled to the exclusive use of certain trademarks that had been registered to it. Alpha Marketing also asserted that the Lottery Commission was infringing on its trademarks, and as relief, it sought damages for lost profits and an injunction to prohibit the Lottery Commission from manufacturing, using, displaying, or selling any imitations of its registered trademarks. The Lottery Commission moved to dismiss the complaint on multiple grounds, including arguments that the trademark registrations had been improperly granted and that the marks were not entitled to trademark protection. In addition, the Lottery Commission moved for dismissal on the independent ground that the doctrine of sovereign immunity barred Alpha Marketing's request for damages and injunctive relief for trademark infringement. In a detailed written order, the circuit court denied the Lottery Commission's motion to dismiss regarding its arguments that Alpha Marketing had not stated a valid cause of action for trademark infringement. However, the court did not rule on the Lottery

Commission's contention that the relief sought by Alpha Marketing was barred by sovereign immunity. Because the circuit court did not rule on the defense of sovereign immunity, and because only that claim is subject to an interlocutory appeal, we dismissed the appeal for the lack of an express ruling on the separate issue of immunity.

Here, the circuit court did rule on the issue of sovereign immunity. Therefore, *Alpha Marketing* does not warrant the dismissal of this interlocutory appeal. In moving to dismiss and for summary judgment, ADC argued that it was entitled to judgment as a matter of law on the basis of sovereign immunity because the Prisoners failed either to plead or to prove viable and cognizable claims to demonstrate the unconstitutionality of the Act. In its orders, the circuit court accepted a few of ADC's arguments, while rejecting others. Thus, the circuit court ruled on each and every contention advanced by ADC to support its defense of sovereign immunity. This appeal contests the court's adverse rulings. By explicitly rejecting ADC's asserted grounds for being immune from suit, the court did, in fact, rule on the issue of sovereign immunity. Consequently, jurisdiction lies over this interlocutory appeal.

III. *Method of Execution*

As its opening argument on appeal, ADC asserts that the Prisoners failed to plead and to prove that the use of the three-drug Midazolam protocol imposes cruel or unusual punishment, as prohibited by article 2, section 9 of the Arkansas Constitution. It argues that the Prisoners did not meet their burden of establishing either that the alternative execution methods proposed by the Prisoners in their amended complaint are feasible and readily implemented by the ADC or that a 500-milligram intravenous dose of Midazolam is sure

SLIP OPINION

or very likely to cause needless suffering. The Prisoners respond that they pled sufficient facts regarding the alternative methods of execution and that a genuine factual dispute remains on that issue, as well as the question whether the Midazolam protocol causes a demonstrated risk of severe pain.

The law is well settled regarding the standard of review used by this court in reviewing a grant of summary judgment. *Fed. Nat'l Mortg. Ass'n v. Taylor*, 2015 Ark. 78, 455 S.W.3d 811. A circuit court will grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. *Quarles v. Courtyard Gardens Health & Rehab., LLC*, 2016 Ark. 112, ___ S.W.3d ___. "[W]e only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, i.e., when there is not any genuine remaining issue of fact and the moving party is entitled to judgment as a matter of law." *Town of Lead Hill v. Ozark Mountain Reg'l Pub. Water Auth.*, 2015 Ark. 360, at 3, 472 S.W.3d 118, 121–22 (quoting *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 569–70, 11 S.W.3d 531, 536 (2000)). The standard is whether the evidence is sufficient to raise a factual issue, not whether the evidence is sufficient to compel a conclusion. *Talbert v. U.S. Bank*, 372 Ark. 148, 271 S.W.3d 486 (2008); *see also Hardin v. Bishop*, 2013 Ark. 395, 430 S.W.3d 49. The object of summary-judgment proceedings is not to try the issues, but to determine if there are any issues to be tried, and if there is any doubt whatsoever, the motion should be denied. *Walls v. Humphries*, 2013 Ark. 286, 428 S.W.3d 517.

On review, this court determines if summary judgment was appropriate based on whether the evidence presented in support of summary judgment leaves a material question of fact unanswered. *Lipsey v. Giles*, 2014 Ark. 309, 439 S.W.3d 13. We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Hotel Assocs., Inc. v. Rieves, Rubens & Mayton*, 2014 Ark. 254, 435 Ark. 488.

When reviewing a circuit court's decision on a motion to dismiss, we treat as true the facts alleged in the complaint and view them in the light most favorable to the plaintiff. *Key v. Curry*, 2015 Ark. 392, 473 S.W.3d 1. In testing the sufficiency of a complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Sanford v. Walther*, 2015 Ark. 285, 467 S.W.3d 139. This court's rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. *Ballard Grp., Inc. v. BP Lubricants USA, Inc.*, 2014 Ark. 276, 436 S.W.3d 445.

Article 2, section 9 of our constitution provides that "cruel or unusual punishments [shall not] be inflicted." ADC's arguments under this point are based on the United States Supreme Court's decisions in *Baze v. Rees*, 553 U.S. 35 (2008), and *Glossip v. Gross*, ___ U.S. ___, 135 S. Ct. 2726 (2015), where the Court addressed the substantive elements of method–of–execution claims under the Eighth Amendment. To prevail on such a claim, a prisoner bears the burden of proving two distinct but interrelated propositions. First, he must establish that the method presents a risk that is "*sure or very likely* to cause serious illness and needless suffering" and that gives rise to "sufficiently *imminent* dangers." *Baze*, 553 U.S.

SLIP OPINION

at 50 (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)). The Court explained that there must be a "substantial risk of serious harm" or an "objectively intolerable risk of harm" associated with the method of execution that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 & n.9 (1994)). Second, a prisoner must prove that "any risk posed by the challenged method is substantial when compared to known and available alternative methods of execution." *Glossip*, 135 S. Ct. at 2737–38. Under this prong of the test, a prisoner "must identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Id.* at 2737 (quoting *Baze*, 553 U.S. at 52). This burden is not met "by showing a slightly or marginally safer alternative." *Id.*

In setting these standards, the Court recognized that, because capital punishment is constitutional, "[i]t necessarily follows that there must be a [constitutional] means of carrying it out." *Glossip*, 135 S. Ct. at 2732–33 (quoting *Baze*, 553 U.S. at 47). The standards were also shaped by the Court's dual observations that, "because some risk of pain is inherent in any method of execution, we have held that the Constitution does not require the avoidance of all risk of pain" and that "[h]olding that the Eighth Amendment demands the elimination of essentially all risk of pain would effectively outlaw the death penalty altogether." *Id.* at 2733.

As we have noted in the past, this court has interpreted article 2, section 9 in a manner that is consistent with precedents under federal law regarding the Eighth Amendment. *See Bunch v. State*, 344 Ark. 730, 43 S.W.3d 132 (2001). In *Bunch*, we said that we will continue

to do so unless a party offers "legal authority or persuasive argument to change our legal course." *Id*. at 739, 43 S.W.3d at 138. In this case, the Prisoners urge us to disavow the requirement established in *Baze*, as amplified by the Court in *Glossip*, that a prisoner bears the burden of proving a known and available alternative to a state's current execution protocol. They assert that we should construe our provision differently because the Eighth Amendment uses the words "cruel *and* unusual punishment," whereas the Arkansas Constitution contains the disjunctive phrase "cruel *or* unusual punishment." As the Court made clear in *Glossip*, the burden of showing a known and available alternative is a substantive component of an Eighth Amendment method-of-execution claim. We are not convinced that the slight variation in phraseology between the two constitutions denotes a substantive or conceptual difference in the two provisions that would compel us to disregard any part of the test governing a challenge to a method of execution. Accordingly, we decline the Prisoners' invitation to depart from our practice of interpreting our constitutional provision along the same lines as federal precedent, and we hereby adopt the standards enunciated in both *Baze* and *Glossip*. Accordingly, in challenging a method of execution under the Arkansas Constitution, the burden falls squarely on a prisoner to show that (1) the current method of execution presents a risk that is sure or very likely to cause serious illness and needless suffering and that gives rise to sufficiently imminent dangers; and (2) there are known, feasible, readily implemented, and available alternatives that significantly reduce a substantial risk of severe pain. We now proceed to a discussion of ADC's arguments that are based on these standards.

ADC first contends that the Prisoners failed to meet their burden of pleading and proving that their proposed alternative methods of execution are feasible and capable of being readily implemented. In opposing this argument, the Prisoners maintain that they sufficiently pled five alternatives to the Midazolam protocol and that, for purposes of summary judgment, they presented sufficient evidence to support their contention that the alternative methods are known and readily available for use.

In their amended complaint, the Prisoners pled that a number of alternative execution procedures are available that would significantly reduce the risk of pain and suffering than the use of the Midazolam protocol. First, the Prisoners proposed execution by firing squad as an alternative. They supported this allegation with the affidavit of Dr. Jonathan Groner, who stated that execution by firing squad, if skillfully performed, would result in "nearly instantaneous and painless death" because "[d]isruption of blood flow to the brain, which would result from lacerations to the heart by multiple bullets, causes almost immediate loss of consciousness, resulting in rapid death with little or no pain." In addition to the firing squad, the Prisoners advocated the use of a massive dose of an FDA–approved, fast–acting barbiturate, such as Brevital and Nembutal. They also offered the option of a massive dose of an anesthetic gas, namely sevoflurane, desflurane, or isoflurane. In addition, the Prisoners proposed the use of a massive dose of an injectable opioid, such as Sublimaze, or a massive dose of a transdermal patch like Duragesic. The Prisoners supported the use of these lethal agents with the report of Dr. Craig Stevens, who holds a doctorate in pharmacology. Stevens opined in his report that any of these drug protocols would produce

a rapid and painless death. Further, he identified the manufacturers of the various drugs and stated that the drugs were commercially available.[2]

To counter the Prisoners' proposed alternatives, ADC presented the affidavits of Executive Director Kelley and of Rory Griffin, ADC's deputy director. In her affidavit, Kelley stated that, before the current protocol was adopted, she had made unsuccessful attempts to obtain a barbiturate to use in carrying out capital punishment by lethal injection. Kelley said that potential suppliers of lethal drugs declined to sell them to the ADC, and she explained that the sellers were concerned about adverse publicity and the loss of business if they were identified as suppliers of drugs used for executions. She further stated that the supplier who sold the FDA-approved drugs currently in ADC's possession agreed to sell the drugs only after receiving a copy of the Act and confirming that ADC is required by law to keep its identity confidential, unless ordered to disclose the information in litigation. Finally, she averred that the supplier has taken the position that it will not provide any additional drugs for use in executions and that she is unaware of the identity of any supplier or manufacturer that will sell drugs for use in executions.

In his affidavit, Griffin stated that he had conducted an investigation into the availability of drugs for use in executions. The investigation consisted of a series of phone calls Griffin made the day before swearing out the affidavit. He reported that Akorn Inc. was not willing to sell Nembutal Sodium Solution for that purpose and that Akorn requires its buyers to sign a form stating that they will not divert Akorn's products to any department

---

[2] The Prisoners attached and incorporated Groner's affidavit and Stevens's report into the amended complaint.

SLIP OPINION

of correction. Griffin reported the same information with respect to the drug Brevital after contacting a representative of Par Pharmaceuticals. He inquired of Baxter Health Corp. about the anesthetic gases of desflurane and isoflurane and was told that Baxter was not willing to sell the gases for executions. Griffin stated that he contacted Jannsen Pharmaceuticals Co. about Sublimaze and Duragesic patches. He was advised to relay his questions in writing and that he could expect a response from them in six to eight weeks. Griffin said that he submitted a written request but that he had not received a response. Griffin stated that he also contacted a wholesale distributor from Louisiana, Morris & Dickson Co., LLC. Paul Dickson, the owner, reported that he would have to obtain approval from the manufacturers before selling drugs to ADC for use in executions.

ADC contends that the Prisoners failed to "plead and prove" that the proposed alternative methods of execution to the Midazolam protocol are feasible and readily implemented by the ADC, as required under the decision in *Glossip*. However, we observe that the procedural posture of *Glossip* is much different from that which is involved in this appeal, which comes to us from motions to dismiss and for summary judgment. In *Glossip*, the case involved the prisoners' request for a preliminary injunction that was denied after a three-day evidentiary hearing. The Supreme Court's decision upholding the findings of the lower court approving the Midazolam protocol was based on the evidence developed in that record and the Court's application of its deferential standard of review to the lower court's findings. This places the Court's statement that the "Eighth Amendment requires a prisoner to *plead and prove* a known and available alternative" in its proper context. *Glossip*, 135 S. Ct. at 2739. Nonetheless, we agree with ADC that the Prisoners have not met their

burden of demonstrating, even at this stage of the proceedings, that the proposed alternative drugs are available to ADC for use in an execution. In their amended complaint, the Prisoners pled only that the drugs they offered as alternatives were "commercially available." That the drugs are generally available on the open market says nothing about whether ADC, as a department of correction, is able to obtain the drugs for the purpose of carrying out an execution. Consequently, the Prisoners failed to even allege that the proposed drug protocols are "feasible" and "readily implemented" by ADC. Accordingly, the circuit court erred in concluding that the Prisoners pled sufficient facts as to the proposed alternative drugs.

We reach the same result with respect to the Prisoners' alternative method of a firing squad. In their effort to show that death by firing squad significantly reduces a substantial risk of severe pain, the Prisoners pled that this method would result in instantaneous and painless death. In terms of whether this method is capable of ready implementation, the Prisoners merely alleged in their amended complaint that ADC has firearms, bullets, and personnel at its disposal to carry out an execution. However, these allegations are entirely conclusory in nature. Conclusory statements are not sufficient under the Arkansas Rules of Civil Procedure, which identify Arkansas as a fact-pleading state. *Worden v. Kirchner*, 2013 Ark. 509, 431 S.W.3d 243; *Born v. Hosto & Buchan, PLLC*, 2010 Ark. 292, 372 S.W.3d 324. In this case, the Prisoners failed to substantiate the conclusory allegations contained in their amended complaint.

We wish to emphasize that merely reciting bare allegations is not sufficient to show that a firing squad is a readily implemented alternative. The law in Arkansas calls for

execution by means of intravenous lethal injection. Ark. Code Ann. § 5-4-617(a). The other authorized method is electrocution, which is to be utilized only after execution by lethal injection is invalidated by a final and unappealable order. Ark. Code Ann. § 5-4-617(k). Execution by firing squad is not identified in the statute as an approved means of carrying out a sentence of death. As such, this proposal does not comply with the current statutory scheme. In our history, the General Assembly has never seen fit to authorize this form of execution. For these reasons, it cannot be said that the use of a firing squad is a readily implemented and available option to the present method of execution. *See Boyd v. Myers*, No. 2:14-CV-1017, 2015 WL 5852948 (WKW) (M.D. Ala. Oct. 7, 2015). As a consequence, ADC was entitled to dismissal on this proposed alternative.

Because the Prisoners failed to satisfy this prong of the test for establishing a claim of cruel or unusual punishment, the circuit court erred by denying ADC's request for dismissal of the Prisoners' method-of-execution challenge. Consequently, we reverse and dismiss the Prisoners' claim.

Before leaving this point on appeal, we must address the Prisoners' assertion that the Midazolam protocol violates the substantive component of article 2, section 8 of the Arkansas Constitution because the lethal-injection procedure using Midazolam entails objectively unreasonable risks of substantial and unnecessary pain and suffering. On this issue, the circuit court ruled that the Prisoners need not satisfy the requirement of offering a feasible and readily implemented alternative to the Midazolam protocol. We agree with ADC's contention that this claim must be analyzed under the two-part test we have herein adopted for method-of-execution challenges. "If a constitutional claim is covered by a

specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). In applying this principle, courts have concluded that an Eighth Amendment claim that is conterminous with a substantive due-process claim supersedes the due-process claim. *Curry v. Fed. Bureau of Prisons*, No. 05-CV-2781, 2007 WL 2580558 (PJS/JSM) (D. Minn. September 5, 2007) (collecting cases); *see also Oregon v. Moen*, 786 P.2d 111, 143 (Or. 1990) (recognizing that "if the imposition of the death penalty satisfies the Eighth Amendment, it also satisfies substantive due process"). This claim also fails because, as we have discussed, the Prisoners failed to establish the second prong of the *Glossip* test.[3]

## IV. *Confidentiality*

In this appeal, ADC also contests the circuit court's ruling—that the Act's provision keeping the identification of the drug supplier confidential—offends the Arkansas Constitution on a number of grounds. The circuit court determined that disclosure of the supplier is compelled as a matter of procedural due process and that the confidentiality requirement violates the provision regarding freedom of speech and of the press, the contract clause, and the publication clause.

---

[3] In its brief, ADC presents the argument that the Prisoners' claims of cruel or unusual punishment concerning the electric chair and compounded drugs are speculative and not ripe for review. We agree that the scope of our review is limited to the three-drug protocol that ADC has chosen as the current method of execution.

These questions appear to be moot. However, we address them under the exception to the mootness doctrine as concerning issues that raise considerations of substantial public interest which, if addressed, would prevent future litigation. *Gray v. Mitchell*, 373 Ark. 560, 285 S.W.3d 222 (2008). "Where considerations of public interest or prevention of future litigation are present," this court may, at its discretion, "elect to settle an issue, even though moot." *Owens v. Taylor*, 299 Ark. 373, 374, 772 S.W.2d 596, 597 (2008). We discuss each issue in turn.[4]

## A. Procedural Due Process

In their amended complaint, the Prisoners asserted that the right of due process found in article 2, section 8 of our constitution compels disclosure of the identity of the supplier of the drugs. Article 2, section 8 provides that no person "shall be deprived of life, liberty, or property, without due process of law." The argument made by the Prisoners is based on the notion that the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *See Washington v. Thompson*, 339 Ark. 417, 6 S.W.3d 82 (1999). Thus, they contend that, if the State proposes to deprive them

---

[4] In dissent, Justice Hart is mistaken in her belief that the disclosure claims cannot be considered because ADC has presented no separate argument contesting the circuit court's denial of its request for a protective order. ADC filed its motion seeking a protective order in response to the circuit court's scheduling order requiring disclosure of the supplier of the drugs following the court's denial in part of ADC's motion to dismiss. The request for a protective order was made in accordance with the Act and was not presented in connection with its claims of sovereign immunity. Therefore, the denial of the motion for protective order was not subject to being appealed on an interlocutory basis pursuant to Rule 2(a)(10). Otherwise, an appeal from the denial of a protective order is not granted as a matter of right under Rule 2(f). Instead, this court may, in its discretion, accept review and only when a circuit court makes the findings required by the rule. The circuit court made no findings in this instance to support an interlocutory appeal.

of their lives, they are entitled to a meaningful opportunity to challenge the deprivation. Consequently, the Prisoners argue that the disclosure of the identity of the supplier is essential for them to have a meaningful opportunity to litigate their claim of cruel or unusual punishment. ADC contends that the circuit court erred by accepting this argument to require disclosure. We agree.

To sustain their allegation that the Midazolam protocol violates the ban on cruel or unusual punishment, it is incumbent on the Prisoners to show that the method of execution presents a risk that is sure or very likely to cause serious illness and needless suffering and that gives rise to sufficiently imminent dangers. However, the Prisoners have failed to establish that the identity of the supplier of the drugs bears any relevance to that claim. Here, the provenance of the drugs is not in question. ADC voluntarily submitted the drugs it had obtained to an independent laboratory for testing. The test results confirmed that the contents of the vials match the FDA–approved labeling and revealed that all three drugs meet applicable potency requirements. In light of this evidence, identifying the supplier of the drugs serves no useful purpose in establishing the Prisoners' claim. Discovering the identity of the supplier does not aid their cause, nor will the lack of knowledge hinder their ability to prove their contention that the protocol is constitutionally suspect. The circuit court clearly erred in ruling that disclosure is required as a matter of due process. We are in agreement with other courts who have reached a similar conclusion. *See, e.g.*, *Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015); *Wellons v. Comm'r*, 754 F.3d 1260 (11th Cir. 2014); *In re Lombardi*, 741 F.3d 888 (8th Cir. 2014); *Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013); *Valle v. Singer*, 655 F.3d 1223 (11th Cir. 2011); *Phillips v. DeWine*, 92 F. Supp.

3d 702 (S.D. Ohio 2015); *Pardo v. State*, 108 So. 3d 558 (Fla. 2012); *Lockett v. Evans*, 330 P.3d 488 (Okla. 2014); *West v. Schofield*, 460 S.W.3d 113 (Tenn. 2015). Accordingly, we reverse the circuit court's decision on this point.

In their amended complaint, the Prisoners also asserted that the substantive right to be free from cruel or unusual punishment implies certain procedural safeguards, which include access to information necessary to determine a violation of that right. They alleged that the Act violates this implied procedural protection by restricting access to information that leads to the identification of the persons or entities who supply lethal-injection drugs. The question whether the right to be free from cruel or unusual punishment includes a complementary right of due process is an issue of first impression in our court. However, we need not resolve that question in this appeal. It is enough to say that, based on the foregoing discussion, the Prisoners have failed to demonstrate that the identity of the supplier of the drugs is germane to their cruel-or-unusual-punishment claim. Consequently, we also reverse on this issue.

## B. Liberty of Speech and of the Press

In this point on appeal, ADC contends that the circuit court erred in concluding that the Prisoners satisfied their burden of proving the elements of their claim that is made pursuant to article 2, section 6 of the constitution. In support of the circuit court's decision that disclosure is required under this provision, the Prisoners contend that the State has a tradition of publicizing information about the suppliers of execution drugs and that openness and debate are essential to the functioning of the criminal-justice system, including the implementation of the death penalty.

Article 2, section 6 governs the rights of free speech and freedom of the press, and it is Arkansas's equivalent to the First Amendment. To determine whether a First Amendment right of access attaches to a particular proceeding, courts consider "whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8 (1986). This right of access is not absolute. *Id*.

From our review of the record, even if it may be said that there is a tradition in Arkansas of identifying the supplier of drugs used in executions, we cannot conclude that disclosure is compelled under the second prong of the test. As revealed in the decisions of *Baze* and *Glossip*, it has become a matter of common knowledge that states which sanction capital punishment have encountered increasing difficulties in obtaining drugs that are used to carry out the sentence of death by lethal injection. The undisputed affidavits of Kelley and Griffin reflect this predicament by demonstrating ADC's own obstacles to acquiring the drugs and the unwillingness of suppliers to sell the drugs to a department of correction. As stated by Kelley, the current supplier of the drugs agreed to provide them only on the condition of anonymity, and that supplier is no longer inclined to sell the drugs to ADC. Griffin's affidavit also shows that manufacturers prohibit distributors from selling the drugs to departments of correction. Given the practical realities of the situation, as borne out by this record, the circuit court erred in ruling that public access to the identity of the supplier of the three drugs ADC has obtained would positively enhance the functioning of executions in Arkansas. As has been well documented, disclosing the information is actually

detrimental to the process. *See Zink*, 783 F.3d at 1113 (holding that public access to the identity of suppliers of drugs for lethal injections does not play a significant role in the functioning of the process "given that the practical effect of public disclosure would likely be frustration of the State's ability to carry out a lawful sentence"). Disclosure is not required as a matter of free speech. *See Wellons*, *supra*; *Phillips*, *supra*.

In concluding this issue, we observe that the General Assembly has declared, as a matter of public policy, that capital murder may be punishable by death. As recognized by the Supreme Court, a state "has a legitimate interest in carrying out a sentence of death in a timely manner." *Baze*, 553 U.S. at 61. In aid of that process, the General Assembly has determined that there is a need for confidentiality.[5] The question whether the enactment is wise or expedient is a matter exclusively for the General Assembly to decide. *State v. Martin*, 60 Ark. 353, 30 S.W. 421 (1895). We reverse the circuit court's ruling on this issue.[6]

---

[5] Arkansas is not alone in adopting legislation imposing confidentiality requirements with regard to executions by lethal injection. *See* Ariz. Rev. Stat. Ann. § 13-757(C) (2010); Ga. Code Ann. § 42-5-36(d)(2) (2014); Fla. Stat. Ann. § 945.10(1)(g) (2014); La. Stat. Ann. § 15:570(G) (2014); Mo. Ann. Stat. § 546.720 (2007); Ohio Rev. Code Ann. § 2949.221 (2015); Okla. Stat. Ann. tit. 22, § 1015 (2016); S.D. Codified Laws § 23A-27A-31.2 (2014); Tenn. Code Ann. § 10-7-504(h)(1) (2016). Courts that have addressed the issue have upheld the laws keeping the identity of the supplier of lethal-injection drugs confidential. *Phillips*, *supra*; *Owens v. Hill*, 758 S.E.2d 794 (Ga. 2014); *Bryan v. State*, 753 So. 2d 1244 (Fla. 2000); *Evans*, *supra*.

[6] In connection with this point on appeal, the Prisoners filed a motion to strike the portion of ADC's reply brief where it cited *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), to argue that the First Amendment does not provide a right of access to documents that are not open to the public generally. The Prisoners contend that this discussion should be struck because ADC is raising a new argument in the reply brief, a practice that is not countenanced by this court. *See JurisDictionUSA, Inc. v. Loislaw.com, Inc.*, 357 Ark. 403, 83

C. Contract Clause

The contract clause is found in article 2, section 17 of the constitution, and it provides that "[n]o . . . law impairing the obligation of contracts shall ever be passed." Under this point, ADC asserts that the Act does not offend the contract clause because the settlement agreement the Prisoners rely on to require disclosure of the identity of the supplier applied only to litigation that has since been concluded. Alternatively, it argues that the contract clause is not absolute and that the Act is a valid exercise of police power. ADC's first argument has merit, which obviates the need for us to discuss the second contention.

The settlement agreement at issue was entered into by ADC and the Prisoners, with the exception of Ledell Lee, in connection with their previous lawsuit, designated as Case No. 60-CV-13-1794, challenging the validity of Act 139 of 2013 and the lethal–injection protocol that had been adopted pursuant to that legislation in April 2013. The agreement also touched on a separate action, Case No. 60CV-13-1204, involving a FOIA request where the circuit court had ruled in favor of ADC but had not yet issued a final order. According to the settlement agreement, ADC had decided to not use the April 2013 execution protocol, which rendered moot the Prisoners' as-applied constitutional challenges to the protocol. As its purpose, the parties "agreed that the pending litigation between them can be streamlined in a manner that allows for the efficient litigation of their disputes." To that end, the Prisoners agreed to amend their complaint concerning Act 139 to omit their

S.W.3d 560 (2004) (observing that a new issue may not be raised for the first time in the appellant's reply brief). Given our disposition of this issue, the motion to strike is moot.

SLIP OPINION

as-applied claims with the understanding from ADC that, "in the event that ADC adopts a new lethal-injection protocol before Case No. 60CV-13-1794 has been litigated to a final judgment," the Prisoners had the right to amend their complaint to reassert as-applied challenges to the new lethal-injection procedure without ADC asserting the defense of res judicata. ADC also agreed to not raise that defense if the Prisoners initiated a separate lawsuit to present as-applied challenges to "ADC's new protocol" on the ground "that such claims are barred because they should have been asserted in Case No. 60CV-13-1794 or Case No. 60CV-13-1204." The settlement agreement contained the following disclosure requirements:

> The defendants agree that, within 10 business days after ADC adopts a new lethal-injection protocol, ADC will provide a copy of the new protocol to counsel for the plaintiffs. In addition, the defendants agree that, within 10 days after they obtain possession of any drugs that ADC intends to use in a lethal-injection procedure, the defendants will notify the plaintiffs' counsel that it has obtained the drugs and will specify which drugs have been obtained and disclose the packaging slips, package inserts, and box labels received from the supplier.

In the case at bar, our object is to ascertain the intention of the parties, not from particular words or phrases, but from the entire context of the agreement. *HPD, LLC v. Tetra Techs., Inc.*, 2012 Ark. 408, 424 S.W.3d 304. In interpreting the meaning of a contract, the first rule of construction is to give to the language the meaning that the parties intended. *Asbury Auto. Used Car Ctr. v. Brosh*, 2009 Ark. 111, 314 S.W.3d 275. To arrive at the intention of the parties to a contract, courts may acquaint themselves with the persons and circumstances and place themselves in the same situation as the parties who made the contract. *Schnitt v. McKellar*, 244 Ark. 377, 427 S.W.2d 202 (1968).

Judged by these standards, we hold that the settlement agreement does not require the disclosure of the identity of the supplier of the drugs used in the present lethal-injection protocol. The agreement reflects that the parties were in the midst of litigation concerning Act 139 of 2013 that allowed execution by means of a benzodiazepine followed by a barbiturate. It is clear that the disclosures required by the agreement with respect to any new protocol were tied to those adopted pursuant to the 2013 Act. The settlement agreement cannot be read as expressing an intention to create a continuing obligation on the part of ADC to make similar disclosures based on protocols adopted in accordance with not yet conceived future legislation. The circuit court's interpretation of the agreement does not reflect the parties' intent, so we must reverse its decision that the Act violated the contract clause. Because there is no existing contractual obligation of disclosure, the Act cannot offend the contract clause of the constitution.

## D. Publication Clause

Article 19, section 12 of the Arkansas Constitution provides,

> An accurate and detailed statement of the receipts and expenditures of the public money, the several amounts paid, to whom and on what account, shall, from time to time, be published as may be prescribed by law.

In contesting the circuit court's decision that the confidentiality requirement of the Act violates the constitution, ADC contends that the phrase, "as may be prescribed by law," indicates that the provision is not self-executing and thus does not give rise to a private cause of action. Again emphasizing that phrase, it argues that the General Assembly has the authority to prescribe the time and the means of disclosure.

This court reviews a circuit court's interpretation of a constitutional provision de novo. *City of Fayetteville v. Wash. Cty.*, 369 Ark. 455, 255 S.W.3d 844 (2007). We are not bound by a circuit court's decision, but in the absence of a showing that the circuit court erred in its interpretation of the law, that interpretation will be accepted on appeal. *Kimbrell v. McCleskey*, 2012 Ark. 443, 424 S.W.3d 844. Language of a constitutional provision that is plain and unambiguous must be given its obvious and common meaning. *Smith v. Wright*, 2015 Ark. 189, 461 S.W.3d 687. Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. *Richardson v. Martin*, 2014 Ark. 429, 444 S.W.3d 855.

In *Griffin v. Rhoton*, 85 Ark. 89, 95, 107 S.W. 380, 382 (1907), this court established the general rules for determining whether provisions of the constitution are self-executing:

> A constitutional provision may be said to be self-executing if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self–executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.
> Cooley's Const. Lim. (7th Ed.) p. 1121. The same learned author in further comment on the subject says: But, although none of the provisions of a constitution are to be looked upon as immaterial or merely advisory, there are some which, from the nature of the case, are as incapable of compulsory enforcement as are directory provisions in general. The reason is that, while the purpose may be to establish rights or to impose duties, they do not in and of themselves constitute a sufficient rule by means of which such right may be protected or such duty enforced. In such cases, before the constitutional provision can be made effectual, supplemental legislation must be had, and the provision may be in its nature mandatory to the Legislature to enact the needful legislation, though back of it there lies no authority to enforce the command.

In *Cumnock v. City of Little Rock*, 168 Ark. 777, 271 S.W.2d 466 (1925), we added that the question in every case is whether the language of the constitutional provision is addressed

to the court or to the General Assembly, meaning whether the provision was intended as a present enactment, complete in itself as definitive legislation, or whether it contemplates subsequent legislation to carry it into effect. If there is language indicating that the subject is referred to the General Assembly, the provision is not construed as self-executing. *Cumnock, supra.* In *Griffin, supra,* we held that the framers did not intend the provision under consideration to be self-executing because it contained the phrase "as shall hereafter be directed by appropriate legislation." Accordingly, we also held that a citizen and taxpayer did not have a legal right to enforce obedience to the provision.

We take this opportunity to develop our limited case law concerning article 19, section 12. This court has said that the disclosure requirement is limited to expenditures. *Snyder v. Martin*, 305 Ark. 128, 806 S.W.2d 358 (1991). We also have held that the provision authorized the General Assembly to enact the Publicity Act of 1914, which provided for the publication of laws, reports, and miscellaneous matters, including claims allowed against counties. *See Clark v. Hambleton*, 235 Ark. 467, 360 S.W.2d 486 (1962); *Jeffery v. Trevathan*, 215 Ark. 311, 220 S.W.2d 412 (1949). Thus, there is no doubt that the General Assembly has the authority to pass laws to implement this constitutional provision. The phrase "as may be prescribed by law" supports this conclusion, and under the authorities cited above, this language also indicates that the provision is not self-executing.

Article 19, section 12 states that expenditures of public money, the amounts paid, to whom an expenditure is paid, and on what account "shall" be published "from time to time" "as may be prescribed by law." It is undisputed that an expenditure of public money was made for the purchase of the drugs to be used in executions. The issue is whether the

General Assembly has the authority to direct the circumstances under which the information is to be revealed. In our view, the constitution left it to the General Assembly to determine the time and the manner for the disclosure of public expenditures. In this instance, the General Assembly discharged its obligation in a manner that is consistent with the constitution. In adopting this legislation, it did not completely shield the identity of the supplier from disclosure. Instead, the General Assembly determined that any disclosure is to be made by the ADC in litigation on the condition that it first apply for a protective order. As a matter of general principle, we have recognized that the General Assembly, unless restricted by the constitution, has the full and plenary powers to adopt such policies and prescribe the duties that it demands of officers carrying out such policies when it is deemed best for the peace and welfare of the people. *Campbell v. Ark. State Hosp.*, 228 Ark. 205, 306 S.W.2d 313 (1957). Here, the constitution granted the power to the General Assembly to determine the time and means by which article 19, section 12 is to be implemented. Consequently, the Act does not offend the constitution.

Reversed and dismissed; motion to strike moot.[7]

WYNNE, J., concurs in part; dissents in part.

DANIELSON and HART, JJ., dissent.

---

[7] Under the guise of Arkansas Supreme Court Rule 5-1(j), the parties have favored us with a series of what can only be described as letter briefs. We do not condone this practice. Although the rule requires a litigant to furnish this court and opposing counsel the citation to a case that will be referred to at oral argument that was not cited in his or her brief, it does not permit parties to present argument along with the citation.

**ROBIN F. WYNNE, Justice, concurring in part and dissenting in part.** I believe that appellees satisfied their burden at this stage with regard to their claim that the method of execution set forth in Act 1096 of 2015 substantively violates the Arkansas Constitution's prohibition of cruel or unusual punishment. I further believe that portions of Act 1096 violate article 19, § 12 of the Arkansas Constitution. Accordingly, I concur in part and dissent in part.

The majority's conclusion that appellees failed to satisfy their burden at this stage regarding the second prong of the test announced in *Glossip v. Gross*, __ U.S. __, 135 S. Ct. 2726 (2015), is mistaken. The majority concludes that appellees failed to present facts sufficient create a question of fact regarding whether the risk posed by the challenged method of execution is substantial when compared to known and available alternative methods of execution. Appellees have created a triable issue as to the second prong of the *Glossip* test. They have laid out several different alternatives that they contend carry a reduced risk of severe pain when compared to the challenged method of execution. They have further produced evidence that the methods are available and that they carry a reduced risk in comparison with the method contained in Act 1096. Appellants might be mistaken in their assertions, but that issue is not before us at this stage in the proceedings. I would remand the matter to the circuit court for further proceedings on appellees' substantive challenge to the lethal-injection protocol laid out in Act 1096.

The majority's analysis of whether of the confidentiality requirements of Act 1096 violate article 19, § 12 of the Arkansas Constitution is likewise flawed. As the majority notes, we stated in *Griffin v. Rhoton*, 85 Ark. 89, 95, 107 S.W. 380, 382 (1907), that "[a]

constitutional provision may be said to be self-executing if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." Under this test, article 19, § 12 is self-executing. Far from merely indicating principles, the provision clearly states exactly what information is to be given to the public. The only role given to the General Assembly is to decide *how* to make the information public. One thing that the General Assembly may not do is decide *whether* to make the information public. This is exactly what the nondisclosure provisions of the Act do, and the majority has erroneously chosen to legitimize that overreach of authority by the General Assembly.

The majority further errs by holding that subsection (i)(3) of Act 1096, which allows the Arkansas Department of Correction to disclose the information after obtaining a protective order, brings the nondisclosure provisions within the legislature's authority to determine the time and manner of disclosure. However, article 19, § 12 expressly requires that the information be *published*. To publish something is to declare it publicly or make it generally known. *Webster's Third New International Dictionary* 1837 (2002). Essentially, the majority is saying that a requirement for certain information to be publicly declared is satisfied if a state agency first gets an order *prohibiting the information from being made public*. That makes absolutely no sense whatsoever. Portions of Act 1096 clearly violate article 19, § 12 of the Arkansas Constitution. I would hold those subsections of the Act to be unconstitutional on that basis.

For these reasons I concur in part and dissent in part.

**PAUL E. DANIELSON, Justice, dissenting.** I respectfully dissent. This court lacks jurisdiction to hear this appeal because there was no specific ruling on the issue of sovereign immunity. Arkansas Rule of Appellate Procedure– Civil 2(a)(10) (2015) permits an appeal from an interlocutory order denying a motion to dismiss based on the defense of sovereign immunity. *See Ark. Lottery Comm'n v. Alpha Mktg.*, 2012 Ark. 23, 386 S.W.3d 400. However, before an interlocutory appeal may be pursued from the denial of a motion to dismiss on the ground of sovereign immunity, we must have in place an order denying the motion to dismiss on that basis. *Id.*

Here, the ADC filed an interlocutory appeal from the circuit court's order dated December 3, 2015. Therefore, this court's review is limited to the December 3, 2015 order in determining whether the circuit court ruled on sovereign immunity. In that order, the circuit court makes very specific rulings on each claim, yet makes no ruling on sovereign immunity.

Contrary to the assertion of the majority, *Alpha Marketing* does apply in this case. This court has been clear that it will not presume a ruling from the circuit court's silence, as we have held that we will not review a matter on which the circuit court has not ruled, "*and a ruling should not be presumed.*" *Alpha Mktg.*, 2012 Ark. 23, at 7, 386 S.W.3d at 404 (emphasis in original). As such, this court lacks jurisdiction to hear the instant appeal. Accordingly, I would dismiss this appeal without prejudice.

**JOSEPHINE LINKER HART, Justice, dissenting.** I respectfully dissent. First, the majority addresses issues not preserved for appellate review. Arkansas Code Annotated section 5-4-617(i)(2)(B) (Supp. 2015) provides that the Arkansas Department of Correction

(ADC) "shall keep confidential all information that may identify or lead to the identification of . . . [t]he entities and persons who compound, test, sell, or supply the drug or drugs . . . , medical supplies, or medical equipment for the execution process." Arkansas Code Annotated section 5-4-617(i)(3) provides that the ADC "shall not disclose the information covered under this subsection in litigation without first applying to the court for a protective order regarding the information under this subsection." Thus, according to the statute, there is not an absolute bar to the disclosure of the information by the ADC in litigation. Rather, before the information is to be disclosed in litigation, the onus is on the ADC to seek a protective order.

In keeping with the statute, appellants moved for a protective order to shield them from having to disclose the information. In its order filed December 3, 2015, the circuit court denied the motion for a protective order. On appeal, appellants challenge the circuit court's rulings that certain constitutional provisions require disclosure of the information. In their brief, appellants address constitutional claims relating to the contracts clause, freedom of speech and the press, procedural due process, and publication of public expenditures.

Appellants, however, did not present as a separate point on appeal an argument challenging the circuit court's specific ruling denying their motion for a protective order. To the extent that any of the claims raised in this interlocutory appeal were based on an implied ruling on sovereign immunity, the request for a protective order was also based on a claim of sovereign immunity and thus appealable on an interlocutory basis. Furthermore, an order denying a motion for a protective order may be appealed on an

interlocutory basis. Ark. R. App. P.–Civ. 2(f)(1).[1] Because they do not challenge on appeal the circuit court's denial of the protective order, appellants have abandoned any challenge relating to the circuit court's denial. Issues raised below but not argued on appeal are considered abandoned. *See, e.g.*, *State v. Johnson*, 374 Ark. 100, 102 n.1, 286 S.W.3d 129, 131 n.1 (2008). Essentially, by not addressing the issue, appellants have conceded the correctness of the court's order denying the motion for a protective order.

Furthermore, even though the circuit court made findings that disclosure was constitutionally required, the circuit court's denial of appellants' motion for a protective order served as an alternative basis for requiring disclosure. When a circuit court bases its decision on more than one independent ground—such as here, where the circuit court ruled on appellants' constitutional claims, as well as appellants' motion for a protective order and required disclosure of the information—and an appellant fails to challenge all those grounds on appeal—such as here, where appellants addressed only the circuit court's constitutional rulings—we will affirm without addressing any of the grounds. *Evangelical Lutheran Good Samaritan Soc'y v. Kolesar*, 2014 Ark. 279, at 6. Thus, I would affirm the circuit court's decision to require the disclosure without addressing any of its rulings related to disclosure of the information. Moreover, if, as the majority implies, the issue was not appealable, then it is a question to be resolved by this court in a future appeal. Thus, under the majority's analysis, dismissal is premature.

---

[1] Appellees made no effort to comply with the rule.

Second, the majority holds that the circuit court erred in concluding that appellees pleaded sufficient facts as to the alternative methods of execution. In reviewing the trial court's decision on a motion to dismiss under Ark. R. Civ. P. 12(b)(6), this court treats the facts alleged in the complaint as true and views them in a light most favorable to the party who filed the complaint. *Waller v. Kelley*, 2016 Ark. 252. In testing the sufficiency of the complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Id*. The majority does not treat the facts alleged as true or liberally construe the complaint, and it considers materials outside of the pleadings. Furthermore, the appellate posture of this case is unusual in that Rule 2(a)(10) of the Arkansas Rules of Appellate Procedure–Civil permits an appeal from an interlocutory "order denying a motion to dismiss . . . based on the defense of sovereign immunity." Rule 12(j) of the Arkansas Rules of Civil Procedure provides, "Attorneys will be notified of action taken by the court under this rule, and, if appropriate, the court will designate a certain number of days in which a party is to be given to plead further. When a dismissal pursuant to Rule 12(b)(6) is granted because the complaint is determined to be factually insufficient, then it is improper for such a dismissal to be granted with prejudice and without leave to plead further pursuant to Rule 12(j). *Ballard Grp., Inc. v. BP Lubricants USA, Inc.*, 2014 Ark. 276, at 19, 436 S.W.3d 445, 456. Because the majority dismisses for failure to plead sufficient facts, I submit that the dismissal is without prejudice, and appellees may plead further.

Third, the majority disregards a critical distinction between the state and the federal constitution. Article 2, section 9 of this state's constitution prohibits the infliction of

"cruel or unusual punishments." In contrast, the Eighth Amendment to the federal constitution prohibits the infliction of "cruel and unusual punishments." Appellees ask this court to consider the distinction between the words "and" and "or" and to reject the two-prong test that the United States Supreme Court has developed in its cases interpreting the Eighth Amendment. The majority rejects this notion, holding that "[w]e are not convinced that the slight variation in phraseology between the two constitutions denotes a substantive or conceptual difference in the two provisions that would compel us to disregard any part of the test governing a challenge to the method of execution." However, as one treatise has noted, "The conjunctions *and* and *or* are two of the elemental words in the English language. . . . [A]*nd* combines items while *or* creates alternatives. Competent users of the language rarely hesitate over their meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012). The distinction is dismissed by the majority, and this case serves as an unfortunate precedent for future cases involving the interpretation of statutes, contracts, or the state constitution.

*Leslie Rutledge*, Att'y Gen., by: *Lee P. Rudofsky*, Solicitor General, and *Jennifer L. Merritt*, Ass't Att'y Gen., for appellants.

*John C. Williams*, Federal Public Defender Office; and *Jeff Rosenzweig*, for appellees.